UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NORA A. FIGUEROA,<br><br>  Plaintiff,<br><br>  v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>  Defendant. | Civ. No. 2:12-04932 (WJM)<br><br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

     Plaintiff Nora Figueroa, a former outreach worker who suffers from diabetes, bipolar disorder, anxiety disorder, and obsessive compulsive disorder, brings this action pursuant to 42 U.S.C. §§ 405(g), seeking review of a final determination by the Commissioner of Social Security (the "Commissioner") concluding that Figueroa was not under a disability from September 5, 2005 through May 25, 2010, and denying Figueroa's application for Social Security Disability ("SSD") Benefits and Supplemental Security Income ("SSI") Benefits.  For the reasons that follow, the Commissioner's decision is **VACATED** and **REMANDED**.

**I.   BACKGROUND**

     The record includes medical records and evaluations from treating physicians, treating mental health professionals, and non-treating consultant physicians.  It also includes Figueroa's testimony about her condition.

     **A.   Treating Mental Health Providers**

     From at least April 16, 2008, Figueroa has received mental health treatment at Phoenix Interfaith Counseling. Administrative Transcript ("Tr.") 411.  In an initial self-assessment, Figueroa described a history of sexual abuse in her family. *Id.* at 397. Figueroa reported that she suffers from obsessions that "take up a lot of time and stress other people out." *Id.* at 394.   Figueroa reported periodic suicidal thoughts, and a suicide attempt in 1991. *Id.* at 398.  Also, Figueroa reported hearing voices telling her: "do yourself in." *Id.*  Tracy Krause, a licensed associate counselor ("LAC"), gave Figueroa a Global Assessment of Functioning ("GAF") score of 52, which indicates moderate symptoms. *Id.* at 403.  During a subsequent psychiatric evaluation, Figueroa

1

reported panic attacks, and psychiatric and mental health nurse practitioner Marian Letellier described Figueroa as "very anxious." *Id.* at 415. Letellier diagnosed obsessive-compulsive disorder, bipolar disorder, panic disorder, and generalized anxiety disorder. *Id.* at 416. Accordingly, Figueroa was placed on Geodon, which treats bipolar disorder, and Klonopin, which treats panic disorder. *Id.* at 418.

The record contains treatment records from LAC Nicole Heim dated May 5, 2008 through November 23, 2009. *Id.* at 419, 513. In an initial session, Figueroa reported anxiety, and her Geodon dose was increased. *Id.* at 422. Several weeks later, Figueroa's symptoms improved and her Geodon dosage was lowered. *Id.* at 425-27. On August 13, 2008, Figueroa described symptoms of akathesia, a condition associated with restlessness and difficulties sitting quietly. *Id.* at 438. Figueroa also described increased anxiety and intrusive thoughts. *Id.* at 440. Accordingly, Figueroa's Klonopin dosage was increased. *Id.* at 441. On September 21, 2008, Figueroa reported experiencing suicidal ideations. *Id.* at 453. In October 2008, Figueroa reported increased anxiety and depression related to increased stressors. *Id.* at 464. In November 2008, Letellier described incremental improvement but noted that Figueroa remained "very distressed, anxious." *Id.* at 471. In December 2008, Letellier found that Figueroa had improved, but Letellier "agree[d] that [Figueroa] could not deal with the stress of working [because she] still presents with anxiety, worry about stressors." *Id.* at 480. Letellier "hop[ed] very much" that Figueroa could do some volunteer work." *Id.* On January 29, 2009, Heim wrote that Figueroa needed to "pursue getting a job," but several months later, on July 9, 2009, Heim wrote that Figueroa "will not be able to function in a job setting under pressure." *Id.* at 562, 586.

On December 11, 2009, Heim filled out a psychiatric/psychological impairment questionnaire. Heim reported that Figueroa suffered from borderline personality disorder, bipolar disorder, obsessive compulsive disorder, and panic disorder. *Id.* at 640. Heim noted that Figueroa's GAF score was 52, up from a low of 51. *Id.* While a score of 52 indicates moderate symptoms, it should be noted that a GAF score of 50 indicates serious symptoms. *See Andino v. Comm'r of Soc. Sec.*, 2013 WL 3354429, at *2 n.1 (D.N.J. July 3, 2013) (citing Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994)). Heim opined that Figueroa "may be able to work in an isolated setting, but [she] lacks social skills and self-control to work effectively with others." Tr. 640.

When it came to Figueroa's ability to perform various activities, Heim identified mostly moderate and marked limitations. *Id.* at 642-45. Heim noted that Figueroa had a "marked" limitation when it came to (1) the ability to work in coordination with or proximity to others without being distracted by them; and (2) the ability to maintain concentration for extended periods; and (3) the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 643-44. Heim explained that Figueroa had "good days" and bad days, that Figueroa was capable of low stress, that Figueroa would likely miss work more than three times per month, and that Figueroa "does not function when depressed or angry." *Id.* at 646.

### B. Treating Physicians

Records from family medicine doctor Shaik Abubakar, radiologist Dr. Richard Flanzman, and podiatrist Dr. John B. Del Monte indicate that Figueroa suffers from diabetes, osteoporosis, and diabetic neuropathy affecting her feet. *Id.* at 251, 280, 283, 293. In one appointment with Dr. Abubakar, Figueroa complained of depression, anxiety, and pins and needles feelings in her legs and feet. *Id.* at 269. In a July 18, 2007 "Examination Report" prepared for the State of New Jersey Division of Family Development, Dr. Abubakar noted that Figueroa had limitations with respect to climbing and using her hands. *Id.* at 228. Dr. Abubakar further opined that Figueroa could not work up to 8 hours per day and 40 hours per week. *Id.* at 229. Dr. Abubakar predicted that Figueroa would be able to begin full time work in early 2008. *Id.* at 229.

In late April 2008, after she relocated from New Jersey to Arizona, Figueroa began to receive care from family medicine doctor Kenneth Pettit. *Id.* at 297. A December 9, 2009 report from Amanda Lewis, a physician's assistant in Dr. Pettit's office, indicates diagnoses of obsessive compulsive disorder, compulsive personality disorder, and affective personality disorder, as well as diabetes and hypertension. *Id.* at 602. In her note, which she reviewed with Dr. Pettit, Lewis wrote: "it is our opinion pt. unable to work, unlikely to ever return to work." *Id.* at 603.

On December 9, 2009, Dr. Pettit and Lewis co-signed a multiple impairment questionnaire reflecting 18 months of treating Figueroa on a monthly or quarterly basis. *Id.* at 629. The medical providers explained that Figueroa had "chronic symptoms from bipolar disorder [and she] gets Angina [from] stress and activity." *Id.* at 630. The medical providers evaluated Figueroa's level of fatigue as an eight to ten on a ten point scale. *Id.* at 631. They further noted that Figueroa could sit for two hours in an eight hour day and stand/walk for zero to one hour, and also that she would have to get up and move around every quarter hour because of anxiousness. *Id.* Here, Dr. Pettit and Lewis relied on the "φ report," which likely refers to records from Phoenix Interfaith Counseling. *Id.* Also, Dr. Pettit and Lewis concluded that stress-related angina made it medically necessary that Figueroa not stand or walk continuously in a work setting. *Id.* at 632.

Additionally, Dr. Pettit and Lewis concluded that Figueroa could occasionally lift up to ten pounds, but not more, and that Figueroa could occasionally carry up to ten pounds, but not more. *Id.* The providers noted that Figueroa's emotional factors contributed to the severity of her symptoms and functional limitations, and that Figueroa was incapable of even low stress. *Id.* at 634. The providers noted that Figueroa would have good days and bad days, that Figueroa would likely be absent from work more than three times monthly, and that Figueroa's symptoms would worsen in a work environment. *Id.* at 633, 635.

3

### C. Evaluations From Consultants

The record also contains evaluations from the following non-treating consultants: psychologist Dr. David Young, surgeon Dr. Murari Lal Bijpuria, and psychiatrist Dr. I. Cohen.

On September 1, 2008, Figueroa appeared for a psychological examination with Dr. Young. The examination was apparently ordered by the Social Security Administration. *Id.* at 323. For some reason—the record does not indicate why—Dr. Young was not provided with medical records to help with his analysis. *Id.* Dr. Young reported that Figueroa was generally oriented and had logical thought processes, but Figueroa was also anxious. *Id.* Dr. Young relayed Figueroa's reports of hallucinations and problems with people. He also noted that Figueroa reported picking her grandson up from school and watching him in the afternoon. *Id.* at 324-25. Dr. Young noted that Figueroa reported exercising at a gym and going to church. *Id.* at 326. Dr. Young diagnosed bipolar disorder, anxiety disorder, and obsessive compulsive disorder. *Id.* In a psychological/psychiatric medical source statement, Dr. Young explained that Figueroa's condition would impose "limitations" on Figueroa's ability to work for 12 months. *Id.* at 327.

On September 12, 2009, Dr. Bijpuria evaluated Figueroa's residual functional capacity. Dr. Bijpuria did not examine Figueroa. Based on his review of the medical records, Dr. Bijpuria concluded that Figueroa could occasionally lift 20 pounds and frequently lift ten pounds, and that Figueroa could stand or sit for six hours per day. *Id.* at 331.

On September 18, 2008, Dr. Cohen evaluated Figueroa's mental residual functional capacity. Dr. Cohen did not examine Figueroa. Dr. Cohen concluded that Figueroa had no significant limitation in social interaction, and that Figueroa would experience only minimal limitation changes in a simple work setting. *Id.* at 341. Dr. Cohen concluded that Figueroa was moderately limited when it came to the ability to maintain attention and concentration for extended periods, and when it came to the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 339-40. Dr. Cohen also concluded that Figueroa was not significantly limited when it came to the ability to work in coordination with or proximity to others without being distracted by them. *Id.* at 339.

Notably, Dr. Cohen's conclusions were based on just two sources. First, Dr. Cohen relied on a report from Dr. Abubakar diagnosing depression. *Id.* at 342. Dr. Cohen described Dr. Abubakar's report as "essentially illegible." *Id.* Second, Dr. Cohen relied on the report provided by Dr. Young. Dr. Cohen noted that Dr. Young's medical source statement about Figueroa mostly reports what Figueroa told Dr. Young about her issues. *Id.*

4

### D. Figueroa's Testimony

Figueroa testified about her impairments on February 3, 2010. *Id.* at 34. She discussed her experience of depression, anxiety, and obsessive compulsive disorder. *Id.* at 42-43. She also testified that she experiences good days and bad days. *Id.* at 46. She testified that she cleans her home, sometimes attends church, and goes to the library. *Id.* at 45, 49, 50.

## II. LEGAL STANDARDS

### A. The Five-Step Sequential Analysis

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. In the first step, the Commissioner determines whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. *Id.* § 404.1520(b), 416.920(b). If not, the Commissioner moves to step two to determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, the Commissioner inquires in step three as to whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A ("Part A"). If so, the claimant is automatically eligible to receive benefits (and the analysis ends); if not, the Commissioner moves on to step four. *Id.* §§ 404.1520(d), 416.920(d). In the fourth step, the Commissioner decides whether, despite any severe impairment, the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f). The claimant bears the burden of proof at each of these first four steps. At step five, the burden shifts to the Social Security Administration to demonstrate that the claimant is capable of performing other jobs that exist in significant numbers in the national economy in light of the claimant's age, education, work experience and RFC. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007) (citations omitted).

### B. Standard of Review

For purposes of this appeal, the court's review of legal issues is plenary. *See Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). The ALJ's factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence supports the ALJ's

factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

The substantial evidence standard is highly deferential. "If a limitation is medically supported but is also contradicted by other evidence, the ALJ can choose to credit portions of the existing evidence and disregard others." *Seabon v. Comm'r of Soc. Sec. Admin.*, No. 10-2268, 2011 WL 3425508, at *8 (D.N.J. Aug. 4, 2011). "The ALJ cannot, however, 'reject evidence for no reason or for the wrong reason.'" *Id.* (internal citation omitted).

In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider the entire record. *Reefer v. Barnhart,* 326 F.3d 376, 379 (3d Cir. 2003). "The court must give deference to the administrative findings and may not 'weigh the evidence or substitute its conclusions for those of the fact-finder.'" *Allen v. Comm'r of Social Sec.*, No. 10-2614, 2011 WL 1321985, at *7 (D.N.J. 2011) (internal citation omitted).

## III.  ALJ KNIGHT'S DECISION

### A.  Steps One, Two, and Three

At step one, administrative law judge Joan G. Knight (the "ALJ") found that Figueroa has not engaged in substantial gainful activity since September 5, 2005, the alleged onset date of Figueroa's disability. Tr. 19. At step two, the ALJ found that Figueroa has several severe impairments: diabetes mellitus with neuropathy, lumbar degenerative disc disease, borderline personality disorder, major depressive disorder, anxiety disorder, and obsessive compulsive disorder. *Id.* At step three, the ALJ concluded that Figueroa's impairments do not meet or medically equal one of the impairments listed in Part A. *Id.* at 20.

### B.  Step Four

At step four, the ALJ determined that Figueroa has the RFC to perform light work with certain restrictions. *Id.* at 22-24. Notably, the ALJ concluded that Figueroa "cannot work with the general public, and can have only minimal, brief interaction with co-workers and supervisors due to personality disorder, anger, and poor impulse control." *Id.* at 22. The ALJ concluded that Figueroa cannot perform her past work as a case aide (*i.e.* outreach worker). *Id.* at 24.

In making her RFC decision, the ALJ pointed to Figueroa's description of her own daily activities, which include caring for her grandson, doing laundry, cleaning and cooking. *Id.* at 23. The ALJ found that the medical evidence did not support Figueroa's claims of disability because the medical evidence indicated that numbness in Figueroa's extremities comes and goes, and that the numbness improves when Figueroa takes her medicine. *Id.*

The ALJ also took into account the opinion evidence provided by doctors and other health professionals. The ALJ gave "great weight" to the evaluation of Dr. Young, a consultant who examined Figueroa on a single occasion, because the ALJ found that Dr. Young's findings were consistent with moderate functional limitations. *Id.* Here, the ALJ pointed to Dr. Young's report that Figueroa "is able to maintain responsibilities in the house." *Id.* Noting that the reports of non-examining and non-treating physicians do not merit as much weight as the reports of examining or treating physicians, the ALJ nevertheless gave "some weight" to Dr. Cohen and Dr. Bijpuria's conclusions because "there exist a number of other reasons to reach similar conclusions." *Id.* As support for this claim, the ALJ cited generally to the findings in her decision.

While the ALJ gave great weight to Dr. Young's opinion, the ALJ gave "little weight" to the opinions of Dr. Pettit, Figueroa's treating family medicine doctor. *Id.* at 24. Here, the ALJ noted that the physical restrictions described in the Impairment Questionnaire completed by Dr. Pettit and Lewis were "not supported by . . . [the] physical findings in the record," findings she characterized as "benign." *Id.* at 24. The ALJ also gave "little weight" to the opinions of Figueroa's treating therapist, Nicole Heim. Here, the ALJ explained that the marked limitations described by Heim were inconsistent with Figueroa's treatment record and daily activities. *Id.* The ALJ also pointed to Figueroa's GAF score, which indicated moderate, rather than serious limitations. Finally, the ALJ determined that Heim's opinion that Figueroa "may be able to work in an isolated setting" was inconsistent with Figueroa's reports of volunteer activities at church. *Id.*

### C. Step Five

At step five, the ALJ concluded that Figueroa is not disabled because she can perform work that exists in significant numbers in the national economy. *Id.* at 25.

In making her step five finding, the ALJ relied on the testimony of a vocational expert. The vocational expert was asked to consider a hypothetical person of Figueroa's age, education, and work history. The hypothetical person could frequently lift and carry ten pounds and occasionally lift and carry 20 pounds. *Id.* at 52. The hypothetical person could stand and sit with normal breaks for six hours. *Id.* The hypothetical person could not climb ladders, ropes, or scaffolds. *Id.* Also, the hypothetical person could not work with the general public, and she could have only minimal, brief interaction with co-workers and supervisors. *Id.* at 53. The vocational expert testified that the hypothetical person could perform two jobs that exist in significant numbers in the national economy: janitor and office helper. *Id.* at 52-53.

Next, the ALJ asked the vocational expert to consider the same hypothetical person but with additional limitations—namely, the limitations Heim believes that Figueroa possesses. Specifically, the hypothetical person had marked limitations in the following areas: (1) the ability to work in coordination with or proximity to others without being distracted by them; (2) the ability to maintain concentration for extended periods; and (3) the ability to complete a normal workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 54. The vocational expert testified that there were no jobs that exist in significant numbers in the national economy that could be performed by a person with those limitations. Because the ALJ concluded that Figueroa resembled the hypothetical person, and not the hypothetical person with additional limitations, the ALJ concluded that Figueroa could work as a janitor or office helper, and that Figueroa was not disabled.

## IV. DISCUSSION

Figueroa challenges the ALJ's step four finding on three grounds. First, Figueroa maintains that the step four analysis gives too much weight to the opinion of Dr. Young, a non-treating psychologist who did not review Figueroa's medical records. Second, Figueroa maintains that the ALJ should have considered additional factors before deciding that Heim's opinions merited "little weight." Third, Figueroa maintains that the ALJ gave too little weight to the opinion of Figueroa's treating physician, Dr. Pettit. The Court is persuaded by Figueroa's arguments. Accordingly, the Court finds that the ALJ's step four finding was not supported by substantial evidence.

The Third Circuit has recognized that an ALJ "should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Astrue*, 554 F.3d 352, 355 (3d Cir. 2008) (internal quotation and citation omitted). "While contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright, such an opinion may be afforded more or less weight depending upon the extent to which supporting explanations are provided." *Id.* (internal quotation and citation omitted). If an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must consider factors including the "(1) examining relationship; (2)(i) length and frequency of treatment; (2)(ii) nature and extent of the treatment relationship; (3) degree to which the evidence supports the opinion; (4) consistency of the record as a whole; [and the] (5) specialization of the physician." 20 C.F.R. § 404.1527(d); *see also Bowers v. Astrue*, No. 10-622, 2012 WL 3150392, at *5 (D. Del. Aug. 2, 2012). In assessing whether to credit a therapist's opinion about the severity of a claimant's symptoms, the ALJ looks to these same factors. 20 C.F.R. § 404.1513(d)(2); SSR 06-03p; *see also Lickenfelt v. Astrue*, No. 7-958, 2008 WL 2275538, *12 (D.N.J. May 30, 2008).

Figueroa is correct: the ALJ erred when she gave "great weight" to the opinion of David Young, a psychologist who examined Figueroa on just one occasion in 2008. Dr. Young diagnosed Figueroa with bipolar disorder, mixed, severe, with psychotic features; anxiety disorder; and obsessive compulsive disorder. *Id.* at 326. He concluded that Figueroa had conditions that imposed limitations for 12 months. *Id.* at 327. Otherwise, Dr. Young just reported what Figueroa told him. Dr. Young did not address Figueroa's ability to work with others, Figueroa's ability to work a full week, or Figueroa's ability to work without an unreasonable number of rest periods. Yet, according to the ALJ, Dr.

8

Young concluded that Figueroa had "no more than moderate limitations in any functional area." *Id.* at 23. Dr. Young never used the word "moderate."

Furthermore, the ALJ ignored the fact that Dr. Young wrote his report without reviewing any of Figueroa's medical records. This is problematic on several levels. *See Jackson v. Astrue*, No. 10-2401, 2012 WL 639304, at *5 (E.D. Cal. Feb. 24, 2012) ("The ALJ erred in rejecting the opinion of plaintiff's treating physician in favor of an examining physician's opinion who did not review the entirety of plaintiff's medical records."). First, as a consultant hired to help the Social Security Administration determine whether Figueroa was disabled, Dr. Young was supposed to be provided with "necessary background information about [Figueroa's] condition." 20 C.F.R. §§ 404.1517 and 416.917. Second, if the ALJ believed that Dr. Young did not need any of Figueroa's medical records to properly assess Figueroa's capabilities, the ALJ failed to give reasons for her belief. *Cf. Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999) ("When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason."). Ultimately, because the ALJ's step four analysis gave "great weight" to Dr. Young's analysis, the ALJ's step four finding are not supported by substantial evidence. And to the degree the ALJ gave some weight to Dr. Cohen's findings—findings that depended almost entirely on Dr. Young's report—the ALJ similarly erred.

While the ALJ gave too much weight to Dr. Young's report, the ALJ did not sufficiently justify her decision to give "little weight" to the opinions of Figueroa's treating therapist, Nicole Heim. Heim concluded that Figueroa had a marked limitation in the following areas: (1) the ability to maintain attention and concentration for extended periods, (2) the ability to work in coordination with or proximity to others without being distracted by them, and (3) the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 643-44. In evaluating Heim's testimony, the ALJ did not consider the length and nature of her treating relationship with Figueroa. This was an error as a matter of law. *See* 20 C.F.R. § 404.1527(d)(2); SSR 06-03p; *see also Lickenfelt v. Astrue*, 2008 WL 2275538, at *12.

Had the ALJ considered the nature and length of Heim's treating relationship with Figueroa, she might have changed her mind about Figueroa's RFC. *See* 20 C.F.R. § 404.1527(c)(2) (opinions of treating sources are generally deserving of "more weight" because such sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individuals examinations, such as consultative examinations or brief hospitalizations"). This Court cannot, in the first instance, determine the proper weight to assign to Heim's opinions. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir.2002) (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir.1992)) (district courts are "not permitted to weigh the evidence or substitute [their] own conclusions for that of the fact-finder").

Finally, Figueroa contends that the ALJ should have given additional weight to the report of Figueroa's treating family medicine physician, Dr. Pettit. The Commissioner argues that the ALJ rightly gave "little weight" to Dr. Pettit's findings because Dr.

9

Pettit's findings are inconsistent with the medical records. But this argument begs the question: which medical records? In giving little weight to Dr. Pettit's opinion, it appears that the ALJ considered only whether Dr. Pettit's opinion was backed up by the evidence of physical problems in the medical record. The ALJ did not recognize that Dr. Pettit's opinion about Figueroa's functional capabilities were predicated partly on Dr. Pettit's views about Figueroa's mental health. *See* Tr. 634 (Figueroa's emotional factors contribute to the severity of her symptoms and functional limitations); *see also id.* at 633, 635 (Figueroa's symptoms would worsen in a work environment). On remand, the ALJ shall reevaluate the weight to give Dr. Pettit's opinion.

In sum, the ALJ made three kinds of mistakes. First, she gave too much weight to Dr. Young's report. Second, she did not address the factors she needed to address before deciding how much weight to give Heim's opinion. Third, she failed to recognize that Dr. Pettit's opinion about Figueroa's functional capabilities was based partly on his assessment of Figueroa's mental health. Because the ALJ's mistakes at step four were carried over to the ALJ's finding at step five, the ALJ shall also reconsider her step five finding.

Before concluding, the Court pauses to address one additional issue. Figueroa maintains that the ALJ improperly discredited testimony about Figueroa's limitations because the ALJ concluded that the testimony was inconsistent with (a) the objective medical evidence, and (b) Figueroa's descriptions of her own daily activities. After the ALJ reconsiders the medical evidence, the ALJ shall reevaluate whether Figueroa testified credibly about her limitations.

## V. CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's analysis erred at the fourth step of the five-step sequential analysis. Accordingly, the decision of the ALJ is **VACATED** and **REMANDED** for reconsideration consistent with this opinion. An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: August 23, 2013**